**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  06-87 (EGS)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **DAVID WEBB** | : | |

**GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND**
**MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia,  respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing

Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early

plea of guilty in this matter, which permitted the government to avoid preparing for trial and

permitted the court to allocate its resources efficiently.  The United States also submits this

memorandum in aid of sentencing.

**I.    BACKGROUND**

The defendant was charged in a two-count information with Transportation or Shipping

Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and 2256, and

Possession of Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)

and 2256.  On June 28, 2006, the defendant pled guilty to Transportation or Shipping Material

Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and 2256, and

Possession of Material Involving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)

and 2256.[1]  At that time the defendant admitted to the following:

---

[1]  The offense of Possession of Material Involving Child Pornography occurred in the
Northern District of West Virginia.  However, the defendant agreed to waive venue and plead

1

On January 25, 2006, United States Attorney's Office Criminal Investigator John Marsh was attending a class in Dulles, Virginia, titled "Safety Net: Multi-Disciplinary Investigation and Prosecution of Computer-Facilitated Child Sexual Exploitation." Part of the class consisted of Marsh communicating with individuals in "Yahoo Messenger." To do this, Marsh created a profile in the Yahoo Messenger address book, portraying himself to be a 15 year-old boy using a screen name of "youngyflyerboy." Marsh communicated with individuals in this online "chat" using instant text messages (IM).

During one of these conversations, Marsh engaged in an IM conversation with an individual who used the screen name "xdbiiiiiiiiiiiiiiiiiiiiiiiiiiiiiii." Marsh then received an email from an individual using the screen name "dick face." The sender's IM dialogue with Marsh revealed that "dick face" and "xdbiiiiiiiiiiiiiiiiiiiiiiiiiiiiiiii," were the same person. The IM dialogue then switched to the screen name "dick face," within the same ongoing chat. The IP address from which the January 25, 2006 email was sent belonged to subscriber David Webb, with an address of 117 Grant Street, Elkins, West Virginia.

Webb, while using the "dick face" handle, indicated he would like to meet the "youngyflyerboy" and requested a phone number. Marsh responded that he could not take incoming calls due to a restriction placed by "youngyflyerboy's" parents. Webb then gave Marsh the telephone number (304) 636-5938. On January 25, 2006, Marsh called the telephone number supplied. Webb answered the phone, and identified himself as a 37 year-old who lived in Elkins, West Virginia.

---

guilty to that offense before this Court. (<u>See</u> Plea Agreement at ¶ 1, attached hereto as Exhibit A).

During the January 25, 2006  IM conversation, Webb asked Marsh if he was 15 years of age, indicating that Webb had looked at the "youngyflyerboy" profile in the Yahoo Messenger Address Book.  Marsh informed Webb that he was actually 14 years old.  The conversation quickly turned to sex and pictures.  Webb then sent Marsh a series of nine images over the internet portraying naked young males.  Some of the pictures depicted these young males engaged in sexually explicit conduct.  Webb sent these images from his home at 117 Grant Street, Elkins, West Virginia, to Marsh in Dulles, Virginia.

The images received from Webb on January 25, 2006, were taken to the National Center for Missing and Exploited Children (NCMEC), where they were compared with NCMEC's Child Recognition & Identification System (CRIS).  The analysis resulted in one of the images being identified as a known minor, (i.e. under age 18).   This image bears the file name: /!!!!![Preteen Boys} - cum ozzing out of his tight young hole(1).jpg.  This image depicts an older man's hands around the bent over buttocks of a young white male minor with the minor's anus visible and a white cream dripping from it.

On February 15, 2006, United States Attorneys Office Criminal Investigator John Regan assumed the "youngyflyerboy" profile.  On that day Webb engaged in further IM conversation with "youngyflyerboy."  During that IM conversation Webb electronically sent three pictures of what appeared to be a male masturbating and ejaculating.  During the same  IM conversation, Webb described a variety of lewd sex acts he would like to engage in with "youngyflyerboy." Regan conducted this IM conversation from a secure computer in the District of Columbia, and was sent the above-described pictures while in the District of Columbia.  Webb sent these images from his home at 117 Grant Street, Elkins, West Virginia.

On February 16, 2006, Regan went online again posing as "youngyflyerboy."  Webb engaged "youngyflyerboy" in further IM conversation. During this IM conversation, Webb sent "youngyflyerboy" over seventy pictures.  Some of those pictures depicted young males engaged in sexually explicit conduct.  During the IM conversation, Webb again described a variety of lewd sex acts he would like to engage in with "youngyflyerboy."  Regan conducted this IM conversation from a secure computer in the District of Columbia and was sent the above-described pictures while in the District of Columbia.  Webb sent these images from his home at 117 Grant Street, Elkins, West Virginia.

The images received from Webb on February 16, 2006, were taken to NCMEC, where they were compared with NCMEC's CRIS.  Eight images were identified as those of known minor victims of child abuse.  These images and their description are as follows:  /021606/2 young boys 15yr jacking.jpg: this image depicts two white male minors rubbing their penises in unison while laying on their backs;  /021606/3 preteen boys with dildo.jpg: this image depicts a white male minor with genitals exposed atop a second white male minor with a third white male minor inserting a dildo into the first minor's anus;  /021606/2_2_Preteen Boys 08 (1).jpg; /2_2_Preteen Boys 08 (1).jpg; /021606/2_2_Preteen Boys 08.jpg; /2_2_Preteen Boys 08.jpg: this  series of four photos depicts a white male minor providing fellatio to another white male minor;  /021606/[gay pict] (preteen) ($\int V f \ddagger f^\wedge$) Preteen Nude Boys cum for pic.jpg; /[gay pict] (preteen) ($\int V f \ddagger f^\wedge$)Preteen Nude Boys cum for pic.jpg: this series of two photos depicts two white male minors on their backs with their genitals exposed.

On February 19, 2006, Regan went online under the profile "youngyflyerboy" again, and again engaged with Webb in further IM conversation. During this conversation, Webb sent

"youngyflyerboy" approximately 17 pictures.  Some of those pictures depicted young males engaged in sexually explicit conduct. Regan conducted this IM conversation from a secure computer in the District of Columbia and was sent the above-described pictures while in the District of Columbia.  Webb sent these images from his home at 117 Grant Street, Elkins, West Virginia.

On February 22, 2006, Investigators Regan and Marsh, along with other members of the United States Attorney's Office Criminal Investigation Unit, West Virginia State Police Officers, and an agent from the Federal Bureau of Investigation executed a search warrant at 117 Grant Street, Elkins, West Virginia.  During the execution of that warrant, Investigator Marsh located computers and storage media in Webb's bedroom which contained over 500 images of child pornography, including several videos and/or video clips.  This computer station consisted of two computers, and was located in Webb's bedroom.  It was the only operable computer station in 117 Grant Street, Elkins, West Virginia.

The images found on Webb's computer and hard drives on February 22, 2006, were taken to NCMEC, where they were compared with NCMEC's CRIS.  Ninety-six images were identified as those of known minor victims of child abuse.  Furthermore, one video file was identified as containing known minor victims of child abuse.

On February 22, 2006,  United States Attorney's Office Criminal Investigators David Reid and Christopher Brophy interviewed David Webb.  Webb admitted ownership of the computers and the storage media found in his bedroom, and stated that he uses a password to access the computer, and that no one else uses the computer.  Webb told the investigators that he used the screen name "xdbiiiiiiiiiiiiiiiiiiiiiiiiiiiiii" to communicate with "youngyflyerboy."  Webb

also admitted that on at least two occasions he sent batches of images to "youngyflyerboy" which contained images of young children and adults. He stated that he has been downloading such images for years, and that he has thousands of such images saved on his hard drives. Webb also told investigators that he used the internet to communicate with other juvenile males, and he characterized himself as a counselor to the juveniles' in regards to their questions of sexuality.

## II.     SENTENCING CALCULATION

### A     Statutory Minimums and Maximums

 Pursuant to 18 United States Code § 2252A, Transportation or Shipping Material Involving Child Pornography carries a minimum sentence of 5 years imprisonment and a maximum sentence of 20 years imprisonment. Pursuant to 18 United States Code § 2252A(b)(2), Possession of Material Involving Child Pornography carries a maximum sentence of 10 years imprisonment

### B.     Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 32. See PSR ¶ 37. This calculation contemplates a three level departure for acceptance of responsibility, and the following enhancements: two levels pursuant to U.S.S.G. § 2G2.2(b)(2) because the material involved a prepubescent minor, five levels pursuant to U.S.S.G. § 2G2.2(b)(3)(C) because the material was distributed to a minor, two levels pursuant to U.S.S.G. § 2G2.2(b)(6) because a computer was used to facilitate this offense, and four levels pursuant to U.S.S.G. § 2G2.2(b)(7)(C) because of the number of images involved. The defendant filed objections with the presentence report writer to each of these enhancements. The government addresses each of the defendant's objections below. The PSR calculates the

defendant's criminal history as Category III.  See PSR ¶ 45.  Therefore, the PSR calculates the guideline range for the defendant at 151 to 188 months.   See PSR ¶ 80.  However, as noted below, it is the government's position that the defendant should receive only a three level enhancement for the number of images possessed, so his guidelines range should be 135 to 168 months.

## III.   GOVERNMENT'S RECOMMENDATIONS

### A.   Acceptance of Responsibility

The government agrees that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines.  He entered a guilty plea early enough in the proceedings to avoid the government's having to prepare for trial, and he appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-sentence investigation. Accordingly, the government is moving the Court to grant the additional one level decrease in base offense level provided for in that Guideline provision.

### B.   Application of the Federal Guidelines post-Booker

It is the government's position that the Court should impose a sentence at the high end of the guidelines range.  In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1).  Booker, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the

7

most reasonable sentence for a particular defendant who has committed a particular crime.

Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the

range as set forth in the Guidelines, the Court must state in a written order of judgment and

commitment the specific reason for the imposition of a sentence different from that described in

the Guidelines.  See 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review

by courts of appeals for "reasonableness."  Id. at 769.

       In Booker's wake, this Court must continue to resolve disputed questions of fact and law

and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See

Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report

or determine that resolution not necessary to sentencing).  "The district courts, while not bound

to apply the Guidelines, must consult those Guidelines and take them into account when

sentencing."  Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)).

In light of this mandate – and the continued requirement of written explanations for sentences

that fall outside of the range called for by the Guidelines and the new standard of

"reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is

reasonable per se.  Not only is a sentence within the Guideline range reasonable per se, but it also

accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair

and uniform sentences.

       The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes,

represent the distillation of two decades of careful study of sentencing practices across the

country, and correlate as well to the varying severity of crimes as defined by Congress.  The

Guidelines, consisting of offense characteristics and various grounds for departure, address the

considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence.  See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns."  Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, 125 S. Ct. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be

10

unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an

appropriate sentence.  In the exercise of its discretion, the court will only depart from those

Guidelines in unusual cases for clearly identified and persuasive reasons."  Id. at 912.  A non-

Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent –

in particular, the overriding concern with uniformity and the prevention of unfair disparities for

similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an

exception to the preference for guideline sentencing.  Therefore, the government respectfully

recommends that the Court sentence the defendant within the Federal Guidelines range

calculated in the Presentence Report.

    C.    <u>Government's Response to Defendant's Objections to the Presentence</u>
<u>Investigation Report</u>

The defendant filed an objection to the Presentence Report, which states:

> pursuant to to Paragraph 4 of the Plea Agreement, the only adjustment to the base
> offense level in this case under U.S.S.G. § 2G2.2 is that Mr. Webb possessed at
> least 150, but less than 300, still images of child pornography, resulting in a 3
> point adjustment to the base offense level.  Therefore, the adjustments pursuant to
> U.S.S.G. § 2G2.2(b)(2) (material involved a prepubescent minor), (b)(3)(C)
> (material was distributed to a minor), and (b)(6) (computer used to facilitate
> offense) do not apply in this case.

<u>See</u> Defendant's September 11, 2006 letter, attached hereto as Exhibit B.  The government

vehemently objects to this characterization of the plea agreement.  Paragraph 4 of the Plea

Agreement reads as follows:

> Your client agrees and will acknowledge that, pursuant to Section 1B1.3 of the
> Sentencing Guidelines, your client: 1) transmitted nine images of child
> pornography from West Virginia to Dulles, Virginia, on January 25, 2006, one of
> which was identified by the National Center for Missing and Exploited Children
> as a known juvenile victim; 2) transmitted seventy images of child pornography
> from West Virginia to the District of Columbia on February 16, 2006, eight of

which were identified by the National Center for Missing and Exploited Children
as known juvenile victims; and 3) transmitted seventeen images of child
pornography from West Virginia to the District of Columbia on February 19,
2006, one of which was identified by the National Center for Missing and
Exploited Children as a known juvenile victim. Your client also agrees and will
acknowledge that your client possessed in West Virginia at least 150, but less than
300, still images of child pornography, 96 of which were identified by the
National Center for Missing and Exploited Children as a known juvenile victims,
and one video which contained known juvenile victims.

See Plea Agreement, attached hereto as Exhibit A. Nowhere in this paragraph, nor anywhere else

in the plea agreement, is there any indication that these are the only applicable enhancements. In

fact, the proffer agreed to and signed by the defendant makes very clear that adjustments to the

defendant's base offense level pursuant to U.S.S.G. § 2G2.2(b)(3)(C) (material was distributed to

a minor), and § 2G2.2(b)(6) (computer used to facilitate offense) apply. The proffer establishes

that the defendant distributed images to an undercover agent who was posing as a 14 year old

boy. The notes following U.S.S.G. § 2G2.2(b)(3)(C) make it very clear that this adjustment

applies to distribution of child pornography to an undercover officer who as posing as a minor:

"'Minor' means . . . an undercover law enforcement officer who represented to a participant that

the officer had not attained the age of 18 years." U.S.S.G. § 2G2.2 note 1. The proffer also

makes it clear that the defendant used a computer for the possession, transmission, receipt, or

distribution of the material, as required in order to apply the adjustment for U.S.S.G. §

2G2.2(b)(6). Furthermore, the defendant admitted that he sent images of child pornography to

"youngyflyerboy" using his computer, and he also admitted that he had been using his computer

to download images of child pornography for years.

It is also the government's position that an adjustment pursuant to U.S.S.G. § 2G2.2(b)(2)

(material involved a prepubescent minor or a minor who had not attained the age of 12 years)

13

applies.  In United States v. Deaton, the Court ruled that imposition of a two level adjustment

pursuant to U.S.S.G. § 2G2.2(b)(2) is appropriate even without independent proof of the

children's ages.  328 F.3d 454 (8th Cir. 2003).  The Court held that "[t]he pictures themselves

support the district court's determination that the images were plainly of children under age 12,

and depicted actual children."  Id. at 456.  The government plans to introduce some of the images

at the sentencing in this case, so the Court will have the opportunity to determine for himself if

the images depict actual children under the age of 12.[2]

     D.    Basis for Government's Sentencing Recommendation

The defendant  has received a number of significant benefits from this plea, and all the

leniency he should receive is encompassed in the concessions already made by the government.

The defendant received a three point decrease in his offense level as a result of his acceptance of

responsibility, and the United States Attorney's Office for the Eastern District of Virginia agreed

not to prosecute the defendant for the January 25, 2006 offense of Transportation or Shipping

Material Involving Child Pornography, in violation of 18 U.S.C. 2252A(a)(1) and 2256.[3]  Had

---

[2]  Defense counsel asked to view the images after the defendant entered his guilty plea, and on October 4, 2006, defense counsel viewed the images which will be presented to the Court at sentencing.

[3]  As noted in the proffer submitted to the Court, the defendant admitted that on January 25, 2006, Webb sent Investigator John Marsh a series of nine images over the internet portraying naked young males.  Some of the pictures depicted these young males engaged in sexually explicit conduct.  Webb sent these images from his home at 117 Grant Street, Elkins, West Virginia, to Marsh in Dulles, Virginia.  The images received from Webb on January 25, 2006, were taken to the NCMEC, where they were compared with NCMEC's CRIS.  The analysis resulted in one of the images being identified as a known minor, (i.e. under age 18).   This image bears the file name:  /!!!!![Preteen Boys} - cum ozzing out of his tight young hole(1).jpg.  This image depicts an older man's hands around the bent over buttocks of a young white male minor with the minor's anus visible and a white cream dripping from it.

the defendant been convicted of this charge, the defendant would have faced an additional five

year minimum sentence.  The government also plans to dismiss the initial indictment at the time

of sentencing.  Had the defendant been convicted of the two counts in the initial indictment, he

would have faced a mandatory minimum of five years incarceration on each count.

The defendant's actions in amassing a library of child pornography fueled an industry that

victimizes children throughout the world.  The serious punishment recommended by the United

States Sentencing Commission reflects Congressional concerns that consumers of child

pornography, such as the defendant, create the market that causes producers of child pornography

to kidnap, drug, and otherwise coerce the young children who are subjects of this ugly

contraband.

The Ninth Circuit has articulated that "commercial child pornography" (images obtained

from the Internet, just like those possessed by this defendant) is the industry targeted by

Congress; moreover, the most effective method of eradicating the industry is to punish the

ultimate consumer.  United States v. Adams, 343 F.3d 1024, 1034 (9th Cir. 2003).

> Th[e] legislative history leads us to three observations:  (1) Congress determined
> that child pornography is a multi-million dollar industry in which sexually explicit
> depictions of children are bought, sold, and traded interstate; (2) Congress decided
> to "stamp out" the market for child pornography by criminalizing the production,
> distribution, receipt, *and possession* of child pornography; and (3) Congress
> thought it could strike a blow to the industry by proscribing possession of child
> pornography "because those who possess and view child pornography encourage
> its continual production and distribution."

Id. at 1032, citing 136 Cong. Rec. at S4730 (emphasis in original).  This Ninth Circuit panel

stressed the national interest in punishing consumers, because "possession of commercial child

pornography [whether the possession resulted from inter- or intrastate sale, trade, or

dissemination] substantially affects the national market for child pornography." Id. at 1034; see also United States v. Rodia, 194 F.3d 465, 477 (3d Cir. 1999) (Polaroid photographs of "naked boys in various sexually explicit poses" does indeed fall within federal reach, because "possession of 'home grown' pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography"). The defendant should acknowledge that his pursuit of these materials does indeed victimize children, since throughout the world, real children are forced or tricked into the degradation that is child pornography, for the mere gratification of adults like this defendant. Moreover, because the Internet has become the distribution medium of the photographs, the degradation of these children is permanent, continuous, and impossible to eradicate.

Clearly, the defendant here fueled the national and international market for child pornography. The defendant's punishment should reflect the impact of his actions on the child pornography industry, and on the true victims, the children who were subjected to the illegal pornographic photographing and videotaping of the many photographs, and the videotapes in his collection. And the victims cannot, and should not, be considered simply in the abstract. They are real, flesh and blood victims of terrible crimes. They have names. They have pets, hobbies, families, and dreams. It is the ultimate insult that all of the victims, whether rescued and identified or not, are left with a terrible burden to carry for the rest of their lives: the knowledge that not only were they victimized by the predators who used the victims to create pornographic images, but that these images remain in circulation, and are viewed again and again and again.

The child victims of pornography will be forced to live with the horrible and depraved sexual acts they were forced to commit for the rest of her life:

16

The trauma of sexual abuse on a child is different from such childhood traumas as experiencing the divorce of one's parents or even being the victim of physical abuse. . . . [F]our traumagenic dynamics – traumatic sexualization, betrayal, powerlessness, and stigmatization – form the core of the psychological injury inflicted by abuse. They alter children's cognitive and emotional orientation to the world, and create trauma by distorting children's self-concept, world view, and affective capacities.

First, a child who is sexually abused is shaped in a developmentally inappropriate and interpersonally dysfunctional way, emerging with (1) inappropriate repertoires of sexual behavior, (2) confusions and misconceptions about his or her sexual identity and the role of sex in affectionate relationships, and (3) unusual emotional associations with sexual activities.

Second, a child who is sexually abused by someone on whom he or she was vitally dependent experiences betrayal by (1) the perpetrator and (2) family members who are not sexually abusing the child but are unable or even unwilling to believe the child, thereby ignoring the child's cry for help. Moreover, child-victims who experience betrayal suffer from an intense need to regain trust and security, manifested in extreme dependency and clinging. As adults, they suffer from impaired judgment about the trustworthiness of other people or even experience hostility and anger towards personal relationships. Furthermore, anger stemming from betrayal may lead to aggressive, hostile or delinquent behavior as a way of protecting the self from future harm or as a way of retaliating against the initial abuse.

Third, powerlessness occurs in sexual abuse when a child's territory and body space are repeatedly invaded against the child's will. Force and threat are not necessary for a child to feel powerless – the mere realization that he or she is trapped, combined with the fear of the consequences of disclosing his or her participation in sexual activity, can create a sense of powerlessness. Nightmares, phobias, hypervigilance, clinging behavior, and somatic complaints related to anxiety have been repeatedly documented among sexually abused children. As adults, the effects of powerlessness can include the impairment of a person's sense of efficacy and coping skills. . . .

Fourth, stigmatization occurs when sexually abused children

17

incorporate negative connotations related to their sexual experiences.  Child-victims may feel isolated and may gravitate to various stigmatized levels of society, thereby becoming involved in drug or alcohol abuse, criminal activity, prostitution, extreme forms of self- destructive behavior, and suicide attempts.

Lydia W. Lee, Note, <u>Child Pornography Prevention Act of 1996: Confronting the Challenges of Virtual Reality</u>, 8 Southern California Interdisciplinary Law Journal 639, 662-64 (1999) (quotation marks and footnotes omitted) (summarizing findings set forth in David Finkelhor & Angela Browne, <u>The Traumatic Impact of Child Sexual Abuse: A Conceptualization</u>, 55 American Journal of Orthopsychiatry 530, 531-36 (1985)).

## IV.    CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to 168 months of incarceration, to be followed by a lifetime of supervised release, with the following special conditions:

1)    Lifetime registration as a sex offender.

2)    Substance abuse treatment.

3)    The defendant shall not possess or use a computer that has access to any on-line computer service at any location, including his place of employment, without the prior written approval of the probation office.  "On-line computer service" includes, but is not limited to, any Internet service provider, bulletin board system, or other public or private computer network.

4)    The defendant shall submit to periodic unannounced examinations of defendant's computer by the probation office.

5)    The defendant shall not possess or use any data encryption technique or program.

6)    The defendant shall maintain a daily log of all addresses accessed by way of any computer, other than those authorized for employment, and shall make the log available to the probation office for review.

7)      The defendant shall consent to third party disclosure regarding computer related restrictions to any employer or potential employer.

8)      The defendant shall not engage in employment, consulting, or associate in any way with children as a profession for the duration of his supervision.

9)      The defendant shall not participate in any volunteer activity that involves contact with minors.

10)     The defendant shall participate in mental health treatment specifically related to sexual offender therapy.

11)     The defendant shall not associate with any known sex offender.

12)     The defendant shall not reside with a child under the age of 18 without the express written approval of the minor's legal guardian and the written permission of the Court.

Respectfully submitted,

JEFFREY TAYLOR
United States Attorney

_____
Catherine K. Connelly
Assistant United States Attorney
Major Crimes Section, Mass.  Bar No. 649430
555 4th Street, N.W.  #4844
Washington, DC 20001
Phone: 616-3384
Fax: 353-9414

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, David Bos, this 12th day of October, 2006.

_____
Catherine Connelly
Assistant United States Attorney

19

**EXHIBIT A**

**EXHIBIT B**